J. J. ULCH, Appellant, v. H. O. WESSEL, Appellee.

FRAUD: Evidence—Sufficiency. Evidence reviewed, and held suf-
1 ficient to carry to the jury the issue of fraud in the purchase of
real estate.

FRAUD: Scienter—Reckless Statements. *Scienter* is *constructively*
2 supplied by the law in those cases where a person asserts a cer-
tain fact to exist, just as though he personally knew it to exist,
when, in truth, he had no knowledge on the subject, did not re-
veal his lack of knowledge, and his assertion is, in fact, false.

PLEADING: Facts Supplied by Implication. An allegation of a fact
3 is sufficiently met by proof from which the law will imply the
fact. (See Sec. 3639, Code, 1897.)

SALINGER, J., dissents from the application made.

PRINCIPLE APPLIED: A pleader alleged that certain rep-
resentations were made with *knowledge* of their falsity by the
one making them. The proof embraced the fact that the party
had no knowledge whatever on the subject, did not reveal his
lack of knowledge, made the representation just as though he
personally knew it to be true, and that the representation was,
in fact, false.

*Held*, the law would imply the allegation of *knowledge*, and
that the pleading was sufficiently met.

*Appeal from Polk District Court.*—LAWRENCE DE GRAFF,
Judge.

JANUARY 17, 1918.

REHEARING DENIED JULY 1, 1918.

ACTION on five notes. The defense pleaded was that
these were obtained by fraud; and by way of counterclaim,
defendant demanded judgment for the amount paid thereon.
Verdict and judgment were for defendant, including recov-
ery of the amount previously paid on the notes. The plain-
tiff appeals.—*Affirmed.*

*Guy A. Miller,* for appellant.

*Ryan & Ryan,* for appellee.

LADD, J.—Recovery is sought by plaintiff on five notes, of the face value of $2,795, on which $424 has been paid, with accrued interest. The defendant answered that the

1. FRAUD: evidence: sufficiency.
notes were procured by fraud, and prayed not only that he might go hence with his costs, but that he have judgment for the amount previously paid on said notes. Reversal is demanded on the sole ground that the verdict is not sustained by the evidence. It appears that one Harley came to Des Moines in the fall of 1913, as agent for the sale of lots in platted additions some nine miles from the city of Astoria, Oregon,—though only about two miles beyond the city limits,—and succeeded in selling 170 of these lots to the parties to this suit, at the agreed price of $6,340. The contract of purchase was entered into, January 6, 1914, by Ulch with Harley, the former executing his promissory notes therefor in the sum of $5,240 and conveying to Harley a lot in the city of Des Moines, at the estimated value of $1,100; and Harley undertaking, in substance, to convey the lots as the notes were paid. These notes were negotiated by Harley, and subsequently taken up by Ulch, who received a conveyance of 66 lots described in the contract and 104 lots in another addition which were substituted by agreement of all parties for a like number included in the contract. On January 9, 1914, in pursuance of an arrangement had prior to the execution of the contract first mentioned, Ulch entered into a written agreement with the defendant, Wessel, reciting that the parties thereto previously had arranged to purchase equal and undivided interests in said lots; that, besides these, Ulch owned 43 lots in the same locality; that Wessel had executed to Ulch the notes in suit for an undivided interest in the 170 lots; that Ulch was about to open an office in Des Moines for the sale

of lots in Astoria, and both parties desired the sale of at least a part of said lots, and therefore the parties undertook that Ulch might sell any of said 213 lots, at prices to be agreed on, and keep accurate account of prices for which each lot should be sold and amounts paid thereon; that, upon "the request of either party hereto, there shall be an accounting between the parties hereto as to the lots which have been sold out of the 213 above described, and as to the moneys which have been received upon said lots, and any money found to be due to the said Harold O. Wessel, party of the second part herein, upon said accounting, shall be applied upon the notes given by the said Harold O. Wessel to the party of the first part herein, in payment for his share of said 170 lots; and after said notes have been paid in full, any balance found due the said Harold O. Wessel shall be paid to him."

The parties were to have equal access to the accounts. On the demand of either party, the 170 lots were to be selected, separate accounts thereof kept, and provision was made for selection of lots in the event that they could not agree.

The defense, as well as the counterclaim, is based on the charge that the notes executed by defendant to plaintiff and the contract entered into by them were obtained by fraud, in that, as is alleged, plaintiff represented to defendant that he was familiar with said lots and their value, and that inside lots were worth $35 each, and corner lots, $40 per lot; that said lots were covered with timber, which, when cut, would sell for more than the price of the lots, whereas said lots, in fact, were not worth to exceed $2 or $2.50 each, and had no timber whatever on them; that defendant knew nothing of said lots, but relied upon said representations, and was induced thereby to execute said notes and contract, with the intent on the part of plaintiff to defraud him. The only controversy is whether the evidence was such that the is-

sues should have been submitted to the jury. Upon a careful examination of the record, we have no hesitancy in saying that the verdict may not be disturbed on this ground. On each issue, the evidence is in sharp conflict, as is apparent from the following extracts from and recitals of the record: The parties hereto were brothers-in-law, having married sisters, and had been acquainted about five years, and had visited each other as might be expected. Defendant testified that he had previously purchased 20 lots near Astoria, Oregon, through Ulch.

"Harley and Ulch came down to the office and talked to me about it. Ulch told me what a good investment this was, and how good the property was,—good lying property,—and about the timber on it. He took me over to the Kirkwood Hotel to meet Harley, and they showed me pictures, purporting to be trees, and said that similar trees on the property would be worth more than the property was worth. Harley said this, and Ulch agreed with him. Ulch talked to me in August, going out to the State Fair, telling me about the property; and I guess on the average of three or four times a week he would come to the office and talk about it, before I met Harley. Ulch told me that the property was in short walking distance of the business section of the town, and that it was a good lying property and had trees on it, and that a state highway went through there. He said timber on the lots was worth more than the price of the lots themselves, and when we cut them, would bring more than the price of the lots. The inside lots were $35, and corner lots, $40; and he said they would sell for $75 and $100, and that the only reason I was getting in at that price was because I was his brother-in-law, and was getting in on the ground floor. This was before I saw Harley. Ulch told me he owned 40 lots, and wanted me to go in with him, which I did. He represented to me that he had paid for these 40 lots the same price that I was paying,—$35 for the inside

and $40 for the corner. He didn't say whether it was in cash or trade. After this conversation, at Ulch's request, both of us went over to see Harley. Harley did most of the talking, but he would say, 'Isn't that so, Jim?' and Jim would agree to it. He repeated what a good investment the property was, and how well it laid, being level, and about the timber on it and the value of them."

The witness told of having bought 20 lots of Harley, through Ulch, and proceeded:

"Most of my talking in regard to the value of the property was to Ulch entirely, and when I went to see Harley, he merely repeated, and showed me pictures of property around there, and of the timber. After I bought these 20 lots, I had a number of conversations with Ulch. He told me that he had 40 lots, and he knew the value of the property there; and I told him I didn't know anything about it. This was before I bought the 20 lots. After that, he came down there again, and talked to me about buying a quantity of them, saying that he wanted to get the agency here, and that Harley wanted somebody to go in with him, and he wanted me to go in with him, and I told him I could not pay for it. Ulch had three or four lots in Warrentown, near there, and had been out there several times, and said he knew the property was worth more than we were paying. He showed me pictures at his house and at Harley's room in the Kirkwood. He said the timber on our property was the same as the picture. He again told me about how it laid and the timber on it, and about the state highway going through there."

The witness then explained that he was without experience in dealing in real estate, and that he never went to see Harley unless Ulch was with him.

"Ulch knew that I didn't know anything about the value of the property out there, and that I didn't know anything about Astoria at all. I told him I would have to depend on

his word entirely, because he always investigated everything before he went into it; and that, if he said it was all right, I would go into it. I would not have purchased the 20 lots or gone into this contract with Ulch for the purchase of a one-half interest of 170 lots, except for the representations made by Ulch to me."

On the other hand, Heefner testified, in substance, that defendant was present at one time when Ulch declared that he knew nothing about the property or its value,—that he merely took a chance; and that he and Ulch exchanged a picture show for some of these lots. Ulch denied knowing anything about the lots, save as informed by Harley, and swore that he had said nothing to the contrary to defendant, and had not said what they were worth, or anything concerning timber growing thereon, or its value, or what the lots would sell for. He testified that, as Harley would not take defendant's notes for one half the price of the lots, for that they were not bankable, he executed to him nine notes, for the aggregate sum of $5,240, and conveyed a lot at a consideration of $1,100, which was worth $150 more than that, under an arrangement with defendant to execute his notes as he did for an undivided one-half interest in the 170 lots; and that he paid the notes executed to Harley, subsequent to their transfer by him; that he had had no arrangement with Harley for a rebate in price or that he should have a commission, and had received neither; and, in substance, that defendant was the aggressor in making the purchase. The witness further testified that he had never seen the lots, and had been no nearer to them than the railroad came, but had been in Astoria three times, and owned several lots in Warrentown, a suburb of and west of Astoria; whereas the Astoria addition was east of the city limits. The deposition of Harley was taken and read in evidence, corroborating the testimony given by Ulch, though saying that Ulch stated that he was familiar with Clatsup County (in which Astoria

is located) property generally, "and had gone over the ground pretty thoroughly in Astoria;" that he knew the location of the lots, but had never seen them, and merely took a chance. Defendant knew nothing about the turning in ot the lot at $1,100 to Harley on the purchase price; and it should be added that notes of $750 were disposed of by Harley to a tenant of Ulch's, and are said to have been satisfied by rents as these became due on his lease.

Such is the evidence in brief, though omitting many of the details. Therefrom the jury might have found that the representations of value and of the timber growth and its value were made, as alleged; that this was done to induce defendant to enter into the arrangement to buy, which was carried out; that the representations were false; and that defendant was ignorant of the facts, and relied on said representations in arranging to take a half interest in the lots, in pursuance thereof. It may be that both Harley and Ulch disputed the evidence on which the finding must have been based. The circumstance that Harley was engaged in the enterprise of deceiving customers into paying $35 or $40 each for lots which he must have understood, because of their location, if for no other reason, were not worth over $2.50 a lot, or what the land would be worth if not platted, would not be likely to commend his credibility to the jury. This alone would warrant the consideration of his testimony with distrust. Moreover, the interest in the deal manifested by Ulch, and his advance on the credit of Wessel, can only be explained away on the theory that he was actuated by benevolent motives toward a relative. It is to be observed, however, that the tie was not of blood; and, in any event, relationship, as well as close friendship, is frequently made use of as an aid in working on another's confidence, and the invitation to "come in on the ground floor" is made with the design to make effective use of the cellar below! The parties hereto testified before the jurors, and the credibility of each

was peculiarly for their determination, as was that of Harley.

But it is argued that there was no proof of *scienter*. Evidently, counsel have overlooked the testimony of defendant that Ulch told him he "knew the value of the property there," and "had been out there several times, and said he knew the property was worth more than we are paying;" "told me about how it laid and the timber on it;" and was aware of defendant's want of knowledge, and that he was relying on what Ulch informed him. The circumstance that Ulch had been at Astoria several times bears on the reasonableness of defendant's story. The jury might have found, from the evidence of declarations of knowledge by Ulch, that he did know the values and conditions of these lots, notwithstanding his denial. If he knowingly made false representations, as alleged, to induce defendant to make the deal, and the latter made it in reliance thereon, the evil design or purpose to defraud is quite naturally to be inferred therefrom. Indeed, when, in addition thereto, it appears that defendant was induced to participate in paying 15 to 20 times the actual value for the lots in question, the inference of such intent would seem all but conclusive. If the fraud alleged was, in fact, perpetrated, the purpose to be subserved is not very material, whether for gain or some other object. That a party, in a deal like that under consideration, makes a showing that he paid in full for the lots, is a strong circumstance to be considered as bearing on his good faith; but it is not conclusive. Persons who engineer such transactions are likely to be somewhat astute in obliterating traces of indirection, and shield themselves as far as to them seems necessary, from detection. That one party reaps no gain, but apparently only takes the chance of loss, is not necessarily inconsistent with findings that he made misrepresentations to the other; that he knew these to be such when making them; and that he so did to induce, and did thereby

induce, the other to part with his property, or incur financial obligations to his injury. This being so, the mere failure of defendant to show that plaintiff did not pay what he undertook to pay for the lots, or that he was to have something back from Harley of that paid, was not fatal to his counterclaim. Even if plaintiff did not know the

2. FRAUD:
scienter:
reckless
statements.

value or condition of the lots with reference to trees growing or not growing thereon, the evidence was such that the jury might have found that he made the representations as though he did know, and without disclosing that he was speaking without knowledge,—in other words, that he made the representations recklessly, careless of whether they were true or false. If so, he might have been found quite as much of a deceiver as though he had known the falsity of his assertions. As said in *Serrano v. Miller & Teasdale Com. Co.*, 117 Mo. App. 185 (93 S. W. 810, 813):

"In such case, inasmuch as the utterer has no knowledge on the subject whatever, it would be impossible to establish a *scienter* by proof showing that he knew the representation to be false, for the reason that no showing pro or con on the subject could be made. Therefore, the law will constructively supply the *scienter* because of the reckless conduct of the utterer, for the very good reason that a positive statement of fact implies knowledge of such fact; and, if the party who makes it has no knowledge upon the subject, he is telling *scienter* what is untrue—he is affirming his knowledge, when in truth he has no knowledge to affirm."

See *Davis v. Central Land Co.*, 162 Iowa 269; *Haigh v. White Way Laundry Co.*, 164 Iowa 143.

Our statute relieves a party from proving more than necessary to sustain his claim or defense, even though more be alleged. The answer alleged that the representations were made with knowledge of their falsity.

3 PLEADING:
facts supplied
by implication.

If the evidence falls short of showing knowledge and shows that the representations

were made recklessly, and in disregard of whether true or false, this is within the allegations of the petition; and the law supplies the *scienter*, on the theory that he is asserting knowledge which he did not possess. In other words, the deduction is with reference to the intent to defraud, and that was distinctly alleged in the counterclaim. Such deduction is no more obviated by the circumstance that the alleged perpetrator of the fraud apparently made or attempted to make financial gain, than where knowledge has been proven.

We entertain no doubt in deciding that the evidence was such as to carry the several issues to the jury, and that there is no room for interference by this court.—*Affirmed.*

PRESTON, C. J., EVANS, GAYNOR, and STEVENS, JJ., concur.

SALINGER, J. (dissenting). The defendant does allege that, though plaintiff knew defendant had no such knowledge, plaintiff said he knew the value of certain lots, their condition and surroundings; that he told this falsehood with intent to cheat defendant; that plaintiff knew, when he so affirmed, of his personal knowledge, that defendant had no knowledge of the value of the lots, and relied on plaintiff; that plaintiff made the false statement to induce defendant to give him the notes he here sues on, and so did induce defendant to give them; and that the lots were not what plaintiff had, of claimed personal knowledge, affirmed them to be, but, on the contrary, were of practically no value.

I agree there is a conflict over whether plaintiff made these representations; that the jury has resolved this conflict in favor of the defendant; and that with this finding we cannot interfere. But that settles nothing except that plaintiff told defendant he had personal knowledge of the value of the lots, though he knew he had no such knowledge; that this induced the giving of the notes; and that the lots were,

in fact, greatly less valuable than plaintiff represented them to be. Concede that this will sustain *some* actions for deceit, will it sustain the action here brought—an action which is bottomed *on knowing that the lots were not as represented,* and not on deceit by recklessly claiming personal knowledge of value when representer knew he had no personal knowledge? I am not denying that one who, with intent to cheat, represents he has seen ore in paying quantities taken from a mine, which he has, in truth, never seen, may commit as great a fraud as if he said there was ore in such quantities when he knew there was no ore. One who fraudulently abuses the faith which believes that his personal knowledge is a guaranty, commits as great a wrong, and may do as much harm, as if he lied about what he had, in fact, seen. Though this is so, it should not abrogate the requirement that proof must correspond to plea. Though one false pretense may be as injurious as another, the charging one is not sustained by proving the other. And so, a claim that one was cheated by a representation that lots had certain attributes, made by one who knew they did not have these attributes, is not sustained, though the jury finds, upon conflict, that the representation made was that he had personal knowledge of these attributes, though he knew he had no such knowledge. That is this case; and one vital objection that I have to the opinion is its holding that the two acts are, in law, equivalent; that a plea of representing a thing has a certain quality, knowing that it has not, and which plea is not based on cheating by a false claim of personal knowledge, is sustained by proof, not that the representer knew he lied about the quality, but about knowing the quality.

Now, while lying about having personal knowledge of the quality of a thing is not the equivalent of lying about the quality of that thing, showing that one has deliberately falsified concerning having knowledge of the quality, and that the quality is, in fact, not what he so affirms it to be,

may raise an inference of fact that he knew the quality was not what he represented it to be. And if all we had was that defendant had falsely claimed personal knowledge, and that the thing spoken to was, in fact, not what he said it was, it might well be claimed that the jury could find that defendant knew the lots were greatly less valuable than he had said they were. But while such an inference was raised, it has, in my opinion, been conclusively rebutted; and when all was said, there was nothing from which the jury could find the charged and essential intent to defraud. Grant that, where one says he knows the quality of a thing when he does not know it, and the quality is, in truth, not as good as he says it is, a presumption arises that he knew the quality is not what he said it was, yet such presumption is not stronger than is the presumption of death from long-continued disappearance. Suppose there be testimony that a person had disappeared and not been heard of for many years; also, testimony that said person had frequently been heard from, and within a year. Here is sharp conflict. If that is all there is, a verdict which finds that the insured is dead would be sustained. But if, after these witnesses had conflicted, a man appeared in court, and the party asserting death should concede he was the alleged dead man, would we sustain a verdict against the insurer because the record exhibited a conflict? Of course, we would refuse to do so, because of the well-settled doctrine that, when a naked presumption of fact is conclusively negatived, there remains no conflict.

The presumption that a deed found with the grantee has been duly delivered, or that statements in a pleading filed by a duly authorized attorney are admissions of his client, is as strong as the inference of *scienter* of which I have spoken. Both the presumption of delivery and of admissions were present in *Schaeffer v. Anchor Mut. F. Ins. Co.*, 113 Iowa 652, at 656; same case, 133 Iowa 205, at 209.

As to one, the grantee testified that the deed reached her after the grantor had died. As to the other, both client and lawyer testified that the statement was not authorized by the client, and put in by the attorney in ignorance that what was admitted was not so. The claim was made that these presumptions and this testimony made a conflict for a jury. But we held against the claim, and that, as matter of law, such testimony overcame these presumptions. The majority has simply failed to grasp that all conflict in this case has become utterly immaterial, because resolving the conflict in favor of the defendant merely raised a presumption that plaintiff was guilty of fraud, and that this presumption was conclusively overcome; wherefore, despite this conflict, there ceased to be a case for a jury.

Recklessness is not fraud. It is, at most, evidence which raises a fact presumption—makes an argument for claiming —that there was an intent to deceive. It is absolutely immaterial that such recklessness is, so to speak, a badge of an intent to deceive, if it must be found that, notwithstanding, there was no intent to deceive. Whatever may constitute evidence of such intent, no actionable fraud is made out unless, when that evidence is given due weight, it can in reason be believed therefrom there was a purpose to defraud. Suppose one declare that he knows a farm he is selling contains 200 acres, when he has no knowledge whatever of what its size is, and after it is sold, it transpires that, when sold, it contained 300 acres, which, the day after the sale, shrunk to 100 acres, because a river cut off 200 acres. Here is your case of recklessly false affirmation, and of ultimate loss. Here is, also, conclusive proof that there was no fraudulent intent. This illustration leads to the crux. Whatever conflict there is here, there is none over the intent of the plaintiff, the person charged with fraud. The evidence of his good faith utterly demolishes every presumption of fraud that could be raised upon resolving the conflict against him.

That is so unless one can intend to cheat another by doing
what he knows must injure him as much or more than the
other. That is what must be held to sustain the majority.
It concedes that the plaintiff and the defendant agreed to
buy the lots; that the paper of defendant was not desired
by the seller, though he was willing to take that of the plain-
tiff; that plaintiff gave his notes for what both he and de-
fendant bought; that he took the notes of defendant for the
half bought by defendant. It appears without dispute that
plaintiff paid the notes he gave for the total purchase,
and that defendant repaid this advance, to a small extent.
He is released from repaying the balance, and gets back all
he has paid. Why? Because plaintiff "defrauded" him into
giving non-bankable notes to cover a loan by plaintiff,
made to enable defendant to buy half the lots. Defrauded,
how? Plaintiff bought half the lots, defendant the other
half; plaintiff paid for both halves, and took non-bankable
notes for his cash. The "fraud" was that a sane man desired
to cheat another by buying as many worthless lots as the de-
frauded one did, and acting as banker for both, without
profit; that he defrauded himself to the same extent, but,
in addition, took chances of losing twice as much as his
"victim." If this plaintiff was actuated by a desire to cheat,
he should be relieved from the consequences, for being in-
sane.

And I am not ignoring that it is no defense to fraud that
the perpetrator profits nothing. *If* there be fraud perpetrat-
ed, one who knows he can gain nothing has not even the
sorry excuse that gain tempted him. But, while lack of gain
does not justify fraud, that the alleged perpetrator knows
there can be no profit, and that he actually will suffer the
greater loss if what he says is false, is most vital evidence on
whether a fraud was intended. The underlying reasoning
has been fully gone into in another connection. If one ad-
mitted having wilfully killed another, it would effect nothing

that he loved the man whom he had murdered, and had everything to lose by his death. But if there was no evidence of the killing, save that he had opportunity to commit it, then undisputed evidence of such affection and lack of mo· tive would be decisive for innocence.

The majority makes a jury question out of whether one who did what he knew must injure himself more than the other, intended to defraud that other.

I do not agree that the abstract rule that credibility is for the jury controls here. This rule does not authorize the rejection of undisputed testimony, when nothing can reasonably be said to affect credibility. Of course, if the jury could find that a material claim of the plaintiff's had no support save witnesses who were not credible, my premise fails. In that case, the inference of fraud has not been overcome, because of the character of the testimony by which it is met. The plaintiff is not impeached because he *may* have been a co-conspirator—a "capper,"— nor because Harley *may* have returned to plaintiff all he paid—plaintiff *may* have done murder. The trouble is there is as much evidence of one as of the other; that is, none, of either. There is none, unless it be the testimony of plaintiff that he had no arrangement with Harley for a rebate in price, none for a commission, and that he had received neither. He is not impeached because he was reckless enough to make a false assertion as to which he must have known that, if believed and acted upon, he would be injured most of all. Such assertion proves he is a reckless optimist, but not that he is a liar. That he was taking the greater risk in dealing with one who had married the sister of his wife, is no impeachment. There is no presumption that men deal crookedly, because the deal is with a brother-in-law. All that is material in this relationship is that it made it more reasonable for defendant to rely upon what plaintiff said. That is all that is effected by the fact that defendant had no knowledge of the value of the lots.

That one of the notes given by plaintiff was sold by Harley to a tenant of the plaintiff's does not impeach plaintiff. Neither is he discredited because the jury was authorized to reject the testimony of Harley. But, at all events, impeachment is of no avail if what the discredited witness speaks to is admitted to be true. That is this case. If every witness for plaintiff were unworthy of belief, the facts upon which his innocence depends are admitted. He did give his own notes for the total purchase, he did pay them, and all he ever got were the non-bankable notes which the majority cancels.

I think we should reverse, on the ground that the evidence shows conclusively plaintiff did nothing with fraudulent intent—did not commit the fraud charged. Defendant may not be without remedy, but he should not recover in this suit.